1

2

3

4

5

6

7

8

9                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
                              AT TACOMA

10

11   TINA M. HARTMAN,                         CASE NO.    C07-5644KLS

          Plaintiff,
                                              ORDER REMANDING THE
12        v.                                  COMMISSIONER'S DECISION
                                              TO DENY BENEFITS
13   MICHAEL J. ASTRUE, Commissioner of
     Social Security,
14
          Defendant.
15

16

17

18        Plaintiff, Tina M. Hartman, has brought this matter for judicial review of the denial of her

19   application for supplemental security income ("SSI") benefits.  The parties have consented to have this

20   matter be heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil

21   Procedure 73 and Local Rule MJR 13.  After reviewing the parties' briefs and the remaining record, the

22   undersigned hereby finds and ORDERS as follows:

23                        FACTUAL AND PROCEDURAL HISTORY

24        Plaintiff currently is 40 years old.[1] Tr. 36.  She attended school until the tenth grade, was in special

25   education classes while in school, and has past work experience as a fast food worker and motel cleaner.

26   Tr. 23, 88, 107, 167-71, 173-75, 185-86, 248, 256.

27   _____

28        [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to
     Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

     ORDER
     Page - 1

On January 9, 2004, plaintiff filed an application for SSI benefits, alleging disability as of August 18, 2001, due to borderline intellectual functioning, illiteracy, hearing problems, and mental/mood disorders. Tr. 14, 64-68, 87.  Her application was denied initially and on reconsideration. Tr. 36-38, 40.  A hearing was held before an administrative law judge ("ALJ") on August 14, 2006, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. Tr. 270-95.

On March 23, 2007, the ALJ issued a decision, determining plaintiff to be not disabled, finding specifically in relevant part:

(1)     at step one of the sequential disability evaluation process,[2] plaintiff had not engaged in substantial gainful activity since January 9, 2004;

(2)     at step two, plaintiff had a "severe" impairment consisting of borderline intellectual functioning;

(3)     at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; and

(4)     at step four, plaintiff had the residual functional capacity to perform work with no exertional limitations, but with a limitation to simple work involving one-to three-step instructions, which did not preclude her from performing her past relevant work.

Tr. 14-24.  Plaintiff's request for review was denied by the Appeals Council on September 24, 2007, making the ALJ's decision the Commissioner's final decision. Tr. 4; 20 C.F.R.§ 416.1481.

On November 19, 2007, plaintiff filed a complaint in this Court seeking review of the ALJ's decision. (Dkt. #1).  The administrative record was filed with the Court on February 5, 2008 (Dkt. #9). Specifically, plaintiff argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a)     the ALJ erred in evaluating the medical evidence in the record;

(b)     the ALJ erred in finding that plaintiff's borderline intellectual functioning did not meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(c); and

(c)     the ALJ erred in assessing plaintiff's credibility.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, hereby finds that while the ALJ's decision should be reversed, this matter should be remanded

---

[2]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

to the Commissioner for further administrative proceedings.

DISCUSSION

This Court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ Erred in Evaluating the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a

treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir. 2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

A.    Dr. Peterson and Dr. van Dam

A mental residual functional capacity assessment form was completed by Anita M. Peterson, Ph.D., in early April 2004, and affirmed by Carla van Dam, Ph.D. in late June 2004. That form contains three sections. Section I – the "summary conclusions" section – lists a number mental functional abilities under four separate category headings: understanding and memory; sustained concentration and persistence; social interaction; and adaptation. Tr. 237-39. Next to each listed mental functional ability are boxes for the evaluator to check to indicate the following: not significantly limited; moderately limited; markedly limited; no evidence of limitation in this category; and not ratable on available evidence. Id. Section I also instructs the evaluator that it "is for recording summary conclusion derived from the evidence in file," and that each mental functional ability "is to be evaluated within the context of the individual's capacity to sustain" that ability "over a normal workday and workweek, on an ongoing basis." Id. Section III of the form – the "functional capacity assessment" section – provides in relevant part:

> Record in this section the elaborations on the preceding capacities, Complete this section ONLY after the SUMMARY CONCLUSIONS section has been completed.

Explain your summary conclusion in narrative form. Include any information which clarifies limitation or function. . . .

Tr. 239.

In section I of the form, Dr. Peterson and Dr. van Dam found plaintiff to be moderately limited in her ability to: (understanding and memory) understand and remember detailed instructions; (sustained concentration and persistence) carry out detailed instructions, maintain attention and concentration, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others, complete a normal workday and workweek, and perform at a consistent pace; (social interaction) interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond to criticism from supervisors, and get along with co-workers or peers; and (adaptation) respond appropriately to changes in the work setting and set realistic goals or make plans independently of others. Tr. 237-39. In Section III, Drs. Peterson and van Dam opined in relevant part:

> A&B [understanding and memory and sustained concentration and persistence]
> The clmt can follow 1&2 step directions and maintain attention and concentration for up to 2hrs at a time. . . .
>
> C [social interaction]
> The clmt can work with a few co-workers and can accept direction from a supervisor but would do best in jobs that did not involve a great deal of public contact. . . .
>
> D [adaptation]
> The clmt can manage basic adaptive demands of the workplace, although limited by BiF [borderline intellectual functioning], but will benefit from assistance with important irrevocable decisions.
>
> . . . Clmt's ADL's [activities of daily living] and MSE [mental status examination] show her mental impairment does not prevent her from completing simple work tasks.

Tr. 239-40.

In his decision, the ALJ stated that "the limitation to work involving no more than simple one- to three-step tasks" was "consistent with the preponderance of the evidence including the opinion" of Dr. Peterson and Dr. van Dam. Tr. 22. The ALJ, however, did not accept their opinion that plaintiff had "significant work-related limitations in social functioning," further noting that while plaintiff had reported "becoming irritable when" having "difficulty performing some tasks," she reported having "no difficulty getting along with authority figures such as bosses or landlords," had "never lost a job because of

problems getting along with people," and was "generally described as cooperative." Id.

Plaintiff argues these are not valid reasons for rejecting the findings of Drs. Peterson and van Dam regarding her limitations in social functioning, pointing specifically to her very limited work history which she asserts shows numerous short-term jobs and evidences an inability to sustain employment. While plaintiff's work history may be as described, even work done on a short-term basis can be sufficient to indicate an ability to get along with authority figures and other people. Nevertheless, as explained below, the undersigned finds the evidence in the record does not support the ALJ's findings here.

It is true that in a questionaire concerning her activities of daily living and socialization plaintiff submitted with her application for SSI benefits, she answered "no" to the questions of whether she had any problems getting along with bosses, police, teachers, landlords, or other people in authority, or had ever lost a job because of problems getting along with people. Tr. 99. Other evidence in the record, however, contradicts these answers. For example, plaintiff's cousin reported that she had problems getting along with others, arguing and getting into fights, that she did not get along well with the same kinds of authority figures noted above, and that she had been fired or laid off from a job because of problems getting along with others. Tr. 119-21. At the hearing, plaintiff herself testified that she had difficulties on the job with co-workers and supervisors. See Tr. 283-85.

The medical evidence in the record, furthermore, also indicates plaintiff has significant problems in these areas. James R. Adams, Ph.D., for example, opined that plaintiff "would have some difficulty coping with the stress of a work-like setting, especially if she had to interact closely with supervisors and fellow workers." Tr. 208. Charles Quinci, Ph.D., opined that plaintiff was markedly limited in her ability to relate appropriately to co-workers and supervisors, and moderately limited in her ability to interact appropriately in public contacts. Tr. 216. Robert E. Schneider, Ph.D., opined that she "would have difficulty tolerating the interpersonal expectations of employment." Tr. 250. Contrary to the ALJ's findings, therefore, plaintiff does appear to have significant difficulties in terms of social functioning.

Defendant argues that because the evidence regarding plaintiff's social functioning here is subject to more than one rational interpretation, the ALJ's conclusion regarding that evidence must be upheld. But this presupposes that there is more than one rational interpretation. Given the weight of the evidence in the record discussed above indicating the presence of significant problems with social functioning,

however, the ALJ reasonably only could have arrived at one rational interpretation on this issue, but failed

to do so.  As such, because of this, and because the evidence in the record was not, as noted above,

inconsistent with the findings of Dr. Peterson and Dr. van Dam concerning the presence of significant

limitations in social functioning, the Court finds the ALJ erred in his analysis.

Plaintiff further argues that the ALJ failed to give any reasons for not adopting the other moderate

limitations noted by Drs. Peterson and van Dam in Section I.  Again, the undersigned agrees.  The lack of

any rationale for rejecting those limitations was error.  Defendant argues plaintiff's argument is misplaced,

because section I of the form – wherein those moderate limitations are noted – is not the assessment of her

mental residual functional capacity.  Instead, relying on the Social Security Administration's Program

Operations Manual System ("POMS"), defendant asserts that it is section III – in which, as noted above, it

was stated plaintiff was able to follow one and two step directions, maintain attention and concentration

for up to two hours at a time, could work with a few co-workers and accept directions from a supervisor,

and could manage basic adaptive demands of the workplace – which constitutes that assessment, and the

ALJ thus properly did not include any limitations from section I.

The undersigned disagrees with defendant's position.  The POMS does provide in relevant part as

follows:

> **NOTE**: The purpose of section I ("Summary Conclusion") . . . is chiefly to have a
> worksheet to ensure that the psychiatrist or psychologist has considered each of these
> pertinent mental activities and the claimant's . . . degree of limitation for sustaining
> these activities over a normal workday and workweek on an ongoing, appropriate, and
> independent basis. **It is the narrative** written by the psychiatrist or psychologist **in
> section III** ("Functional Capacity Assessment") . . . **that adjudicators are to use as
> the assessment of RFC**. Adjudicators must take the RFC assessment **in section III** and
> decide what significance the elements discussed in this RFC assessment have in terms
> of the person's ability to meet the mental demands of past work or other work. This
> must be done carefully using the adjudicator's informed professional judgment.

POMS DI 25020.010(B)(1), https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010!opendocument

(emphasis in original).  In addition, it is true that even though it "does not have the force of law," the Ninth

Circuit has recognized the POMS as constituting "persuasive authority." Warre v. Commissioner of Social

Sec. Admin., 439 F.3d 1001, 1005 (9th Cir. 2006).

Nevertheless, while the POMS may govern how an ALJ is to view the type of form completed by

Dr. Peterson and Dr. van Dam in this case – and may be taken into consideration by the Court in

evaluating the ALJ's treatment thereof as well – this does not mean the evaluating psychologists

themselves felt that they were governed by it or took it into consideration in making their findings. That is, as pointed out by plaintiff, section III of the form directs the evaluator to elaborate and explain the summary conclusions they drew in regard to the limitations noted in section I. There is no direction given on that form to indicate to the evaluator that he or she should treat section III as constituting the claimant's sole and entire mental residual functional capacity. Accordingly, it is not at all clear that Drs. Peterson and van Dam intended their section I findings to be ignored or not considered. While certainly this discrepancy between the POMS and the language of the form itself may create some difficulties for the ALJ in determining how to go about evaluating such evidence, that is an issue for the Social Security Administration to resolve, and not a valid reason to discount potentially significant probative findings.

The undersigned, however, rejects plaintiff's assertion that the moderate limitations found by Drs. Peterson and van Dam in her ability to perform activities within a schedule, maintain regular attendance, be punctual, complete a normal workday and workweek, and perform at a consistent pace, establish that she is unable to sustain competitive employment. In support of this assertion, plaintiff points to the testimony of the vocational expert at the hearing that an individual would not be employable if he or she missed just two days of work per month. See Tr. 289. Thus, plaintiff reasons, because being impaired in these work-related abilities even ten percent of the time would mean she is not performing work at least two days per month, she should be found disabled. Nothing in the record, though, indicates that a moderate limitation in any or all of the above abilities actually would result in missing two days of work per month. Plaintiff's argument here, therefore, is without merit.

B.  Drs. James Adams, Charles Quinci and Robert Schneider

In late February 2004, plaintiff underwent a psychological evaluation performed by James R. Adams, Ph.D., who diagnosed her with a depressive disorder, borderline intellectual functioning, and a current global assessment of functioning ("GAF") score of 40. Tr. 208. Dr. Adams further opined that plaintiff could "understand, remember and carry out simple instructions," and that her concentration, persistence and pace was average, but that she had difficulty with abstract reasoning, and, as noted above, "would have some difficulty coping with the stress of a work-like setting, especially if she had to interact closely with supervisors and fellow workers." Id.

In a psychological/psychiatric evaluation form he completed at the same time, Dr. Schneider found

plaintiff to be severely limited in her ability to understand, remember and follow complex instructions and learn new tasks, markedly limited in her ability to relate appropriately to co-workers and supervisors, and moderately limited in her ability to: understand, remember and follow simple instructions; exercise judgment and make decisions; perform routine tasks; interact appropriately in public contacts; respond appropriately to and tolerate the pressures and expectations of a normal work setting; and care for herself. Tr. 212. Dr. Adams estimated that plaintiff would be impaired to the degree indicated for a minimum of six months. Tr. 213.

Charles Quinci, Ph.D., evaluated plaintiff in mid-September 2004, diagnosing her with low intellectual functioning, mild retardation to borderline range, and a dysthymic disorder. Tr. 215. He found her to be markedly impaired in her ability to: learn new tasks, perform routine tasks; relate appropriately to co-workers and supervisors; and respond appropriately to and tolerate the pressures and expectations of a normal work setting. Tr. 216. In addition, plaintiff was noted to be moderately impaired in her ability to: understand, remember and follow complex instructions; exercise judgment and make decisions; interact appropriately in public contacts; control her physical or motor movements; and maintain appropriate behavior. Id. Dr. Quinci estimated that she would be so impaired for a minimum of 12 months. Tr. 217. In notes attached to the evaluation form Dr. Quinci completed, he further opined as follows:

> Significant cognitive impairment precludes ability to perform for most normal work environments. Probably at best sheltered work place expected or position with high supervision + repetitive tasks. Recommend refer to SSI.

Tr. 219. He deemed plaintiff's prognosis to be poor. Id.

Plaintiff was evaluated by Robert E. Schneider, Ph.D., in early August 2005. Dr. Schneider noted that during the mental status examination, plaintiff's thinking "tended to ramble and was poorly focused," her speech was slow, and she was "very fragile when performing mental status tasks and cried when she couldn't do things and deteriorated" during psychological testing. Tr. 249. Thus, Dr. Schneider found her "[p]erformance on formal mental status was generally impaired." Id. In terms of mental functioning and ability to work, Dr. Schneider further opined in relevant part as follows:

> This individual is quite impaired. She presents as intellectually limited, emotionally fragile and cognitively impaired. Presentation suggests that she would not be capable of tolerating the typical demands and expectations of gainful employment.

. . .

> Tina has difficulty following simple or multi-step instructions, difficulty performing tasks at a reasonable pace, would be incapable of tolerating typical pressures, expectations and feedback of employment and would have difficulty tolerating the interpersonal expectations of employment. She is considered to be functionally disabled. Support of her Social Security Disability application is recommended.

Tr. 249-50. He too felt plaintiff's prognosis to be poor. Tr. 250.

In a psychological/psychiatric evaluation form he completed at the same time, Dr. Schneider also found plaintiff to be moderately limited in her ability to understand, remember and follow simple tasks, control her physical or motor movements and maintain appropriate behavior, and markedly limited in her ability to: understand, remember and follow complex instructions; learn new tasks; exercise judgment and make decisions; perform routine tasks; interact appropriately in public contacts, respond appropriately to and tolerate the pressure and expectations of a normal work setting; and care for herself. Tr. 253. Further, Dr. Schneider opined that plaintiff was "very slow" and "cognitively impaired," and that these limitations were permanent. Tr. 253-54. The above findings were based on the diagnoses of borderline intellectual capacity versus mild mental retardation, a cognitive disorder and depression. Tr. 252.

As with Dr. Peterson and Dr. van Dam, the ALJ found the limitation "to work involving no more than simple one- to three-step tasks" was consistent with the preponderance of the evidence in the record, including the opinions of Drs. James Adams, Quinci and Schneider. Tr. 22. However, as noted previously the ALJ did not adopt the "significant work-related limitations in social functioning" they found, finding that although plaintiff had reported "becoming irritable" when having difficulty performing some tasks, she reported having "no difficulty getting along with authority figures such as bosses or landlords," had "never lost a job because of problems getting along with people," and was "generally described as cooperative." Id. For the same reasons set forth above, this stated basis for rejecting the three examining psychologists' findings with respect to social functioning is invalid as well.

The ALJ also rejected the opinions of Dr. James Adams, Dr. Quinci and Dr. Schneider suggesting that plaintiff's mental functional impairments resulted "in significant functional limitations of a severity to preclude competitive employment," stating that they were "directly contradicted by" her "demonstrated ability to sustain work as a fast food worker at Burger King for an extended period of time and with her ability to perform work as a motel cleaner at a substantial gainful level." Id. Plaintiff argues the fact that she may have performed these jobs at a substantial gainful activity level for a period of time during the

years 2001 and 2002 (see Tr. 88, 107), does not establish she is capable of doing so during the period in which she is alleging disability. The undersigned agrees plaintiff's performance of the above two jobs is not a valid basis for rejecting the opinions of these three examining psychologists.

Defendant asserts that the ability to maintain employment "with a fair amount of success" during an alleged period of disability, demonstrates that a claimant's impairments do not restrict the ability to work to the point of disability. (Dkt. #16, p. 9, citing Drouin v. Sullivan, 966 F.2d 1255, 1258 (9th Cir. 1992). Defendant further asserts that an ALJ may reject a physician's opinion that appears to be inconsistent with a claimant's level of activities. While perhaps true in general, the evidence in the record does not support these assertions in this case. As pointed out by plaintiff, each of the jobs at issue here were performed well before plaintiff was evaluated by Drs. Adams, Quinci and Schneider, although, given that plaintiff alleges disability beginning during the period when she was still working, the ALJ would not necessarily be remiss in discounting the three psychologist's findings with respect to that period of time.

C.    Dr. Brian Adams

In late September 2006, plaintiff was evaluated by Brian Adams, Ph.D., who found that she had "significant cognitive limitations," resulting in a diagnosis of borderline intellectual functioning range and an assessed GAF score of 50. Tr. 264-65. The ALJ gave "little weight" to this GAF score, stating that it was "inconsistent with the remainder of his report." Tr. 22. Plaintiff argues the ALJ erred here, because he did not specify what in Dr. Adams's report was inconsistent with that GAF score. The undersigned agrees. Indeed, a number of findings contained in the report support Dr. Adams's diagnoses. For example, in addition to IQ testing which placed plaintiff in the borderline intellectual functioning range, and possibly even in the mild mental retardation category (Tr. 259, 264), psychological testing also suggested "very limited abstraction ability" and "extremely limited comprehension" (Tr. 258). Plaintiff also was found to score at the 4th grade level in terms of reading, and was noted to have low average memory, attention, sequencing, mental flexibility, and visual search abilities. Tr. 264.

Defendant argues the ALJ properly found the GAF score of 50 to be inconsistent with Dr. Adams's opinion in the same report that plaintiff qualified for no diagnosis other than the one concerning borderline intellectual functioning. But neither the ALJ, nor defendant for that matter, has given any explanation as

1    to why a GAF score of 50 is inconsistent with a diagnosis of borderline intellectual functioning.[3]

2    Certainly, it is not difficult to imagine that a diagnosis indicative of significant cognitive deficits could

3    result in a very impaired ability in social and/or occupational functioning.  Defendant points out though

4    that the ALJ also noted the diagnosis of borderline intellectual functioning did not prevent her from

5    performing production work at Foster Farms at the time. Tr. 22, 257.  Plaintiff testified, however, that she

6    worked at Foster Farms for a period of only three days. Tr. 276.  Thus, the record is devoid of any

7    indication that plaintiff would be capable of performing that job competitively for a sustained period of

8    time.

9        Plaintiff further challenges the ALJ's apparent acceptance of Dr. Brian Adams's lack of diagnosis

10    of "an affective disorder or any other Axis I diagnosis" over the diagnosis of Dr. James Adams, Dr. Quinci

11    and Dr. Schneider, who assessed her with a depressive disorder, a dysthymic disorder and depression

12    respectively. See Tr. 19-20, 22, 211, 215, 252.  The undersigned agrees the ALJ erred here as well.  While

13    it is within the discretion of an ALJ to adopt the opinion of an examining psychologist which is based on

14    independent clinical findings over the conflicting opinion of another examining psychologist, here the ALJ

15    disregarded the diagnoses of three other examining psychologists in favor of that of Dr. Adams. See Saelee

16    v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).

17        One basis the ALJ gave for doing so was that plaintiff had "associated symptoms of depressed

18    mood with situational factors such as having difficulty performing a task, being criticized by her spouse or

19    employer, inability to find work, or losing a job." Tr. 19.  But none of the examining psychologists who

20    diagnosed plaintiff with a depressive or dysthymic disorder expressly found that disorder to be situational

21    only or otherwise similarly limited.  Thus, it appears the ALJ improperly may have substituted his own lay

22    opinion here for that of the substantial objective medical evidence in the record. See Gonzalez Perez v.

23    Secretary of Health and Human Services, 812 F.2d 747, 749 (1st Cir. 1987) (ALJ may not substitute own

24    opinion for that of physician); see also McBrayer v. Secretary of Health and Human Services, 712 F.2d

25    795, 799 (2nd Cir. 1983); Gober v. Mathews, 574 F.2d 772, 777 (3rd Cir. 1978).

26        While it may be, as the ALJ's concluded, that Drs. James Adams, Quinci and Schneider "primarily

27

28

---

[3]See England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in general ability to perform basic tasks of daily life).

attributed" plaintiff's "functional limitations to cognitive deficits rather than an affective disorder (Tr. 19), this does not necessarily mean that they deemed plaintiff's affective disorder had resulted in no significant impact on her functional abilities. Thus, although Dr. Quinci did appear to attribute the mental functional limitations he found to cognitive deficits (see Tr. 216), Dr. James Adams and Dr. Schneider seem to have attributed the limitations they found at least in part to a dysthymic disorder and depression respectively (see Tr. 212, 249, 253). For example, Dr. James Adams found plaintiff's limitations in social functioning were due to depression and anger. Tr. 212. Dr. Schneider found plaintiff to be "quite impaired" in part because she was "emotionally fragile." Tr. 253. Further, Dr. Peterson and Dr. van Dam based the moderate mental functional limitations they found on both her depressive disorder and borderline intellectual functioning. Tr. 227-28, 234, 237-40. Thus, the issue of whether plaintiff's affective disorder significantly impact her mental functional capabilities should be re-considered on remand.

II.     The ALJ's Step Three Analysis Was Improper

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R§ 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id. The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. Tacket, 180 F.3d at 1098.

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R.§ 416.908. It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id. An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2. An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id. at *2. However, "symptoms alone" will not justify a finding of equivalence. Id.

As noted above, the ALJ determined that none of plaintiff's impairments met or equaled the criteria of any of those contained in the Listings, finding specifically in relevant part:

Based on all the evidence of record, the claimant's mental impairment does not meet or medically equal any listing under section 12.00 of the Listings. I find that the claimant's mental impairment results in mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. The claimant is independent in performing self-care activities. She is able to shop, perform yard work and household chores, prepare meals, and use public transportation. She reported she has a driver's license and is able to drive. . . . The claimant has reported becoming irritable when she is unable to perform some tasks. She also has a history of some antisocial behavior, including arrests on drug charges and a felony conviction for theft in 1999. However, she has generally reported an ability to get along with others. Mental status examinations have revealed deficits in memory and concentration and cognitive abilities commensurate with intellectual functioning in the borderline range. There is no indication the claimant has experienced episodes of decompensation of extended duration during the period at issue. The claimant also does not meet the additional requirements of the "C" criteria for listings 12.02, 12.03, 12.04 or 12.06.

The claimant's attorney, Ms. Parham, has asserted the claimant meets the criteria of listing 12.05(C) based on limitations resulting from borderline intellectual functioning in addition to an affective disorder . . . However, listing 12.05(C) requires an individual's adaptive functioning be considered in addition to a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function. While the claimant was placed in a special education program throughout her schooling, she reported dropping out of school in the 10th grade to live with her boyfriend whom she subsequently married at age 20 . . . She stated she never attempted to obtain her GED . . . The claimant is currently able to independently perform activities of daily living despite intellectual functioning in the borderline range. She has reported she was able to obtain a driver's license and is able to drive an automatic transmission car . . . She has been married since 1988 and had provided care for four children. While she reported in August 2005 her children were in the custody of her father-in-law, she stated this was because of marijuana use in their household rather than due to inability to care for the children . . . Moreover, she has demonstrated an ability to sustain work activity in competitive employment as a motel cleaner and a fast food worker.

In addition, the claimant has not demonstrated other impairment [sic] which results in additional and significant work-related limitation of function. Although the claimant has also been diagnosed with an affective disorder (a dysthymic disorder or a depressive disorder, not otherwise specified), the claimant has associated symptoms of depressed mood with situational factors such as having difficulty performing a task, being criticized by her spouse or employer, inability to find work, or losing a job. Examining psychologists have primarily attributed the claimant's functional limitations to cognitive deficits rather than an affective disorder and have generally concluded the claimant remains capable of performing simple or repetitive tasks. Finally, after performing a psychological evaluation of the claimant in September 2006, Brian Adams, Ph.D., reported no diagnosis of an affective disorder or any other Axis I diagnosis . . . As discussed above, the claimant's other diagnosed conditions of spastic dysphonia and obesity do not result in more than minimal limitations in the claimant's ability to perform work-related activities. Accordingly, they do not meet the criteria of an impairment imposing additional and significant work-related limitation of function as required by section 12.05(C).

Tr. 19-20.

Listing Listing 12.05 reads in relevant part:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

. . .

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

. . .

20 C.F.R. Part 404, Subpart A, Appendix 1, § 12.05.

To meet the first criteria of Listing 12.05(C), the claimant's IQ score must be "valid." Maggard v. Apfel, 167 F.3d 376, 380 (7th Cir. 1999). The medical and other evidence in the record can "cast doubt on the validity" of that score. Id. In regard to the second criteria, the ALJ assesses "the degree of functional limitation" the additional impairment imposes to determine if it "significantly limits" the claimant's "physical or mental ability to do basic work activities," i.e., if the impairment is "severe" as defined in 20 C.F.R. § 416.920(c). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A).

In addition to the above two criteria, the claimant must demonstrate his or her impairment "satisfies the diagnostic description" for Listing 12.05 contained in the explanatory material for mental disorders under 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.00. See Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)). The Commissioner's regulations provide specifically that:

. . . Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing. . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) (emphasis added). To be found disabled under Listing 12.05(C), therefore, plaintiff also must show that she had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" prior to age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Plaintiff argues that, contrary to the ALJ's findings, her mental impairments meet the above criteria for Listing 12.05(C). Specifically, plaintiff asserts that the record reveals valid verbal IQ scores in the required range of 60-70. Defendant does not dispute this assertion, and the Court finds this to be the case

as well. See Tr. 169, 207, 259. Plaintiff further argues she meets the second requirement for meeting the criteria of Listing 12.05(C). That is, she asserts, as noted above, she has a "physical or other mental impairment imposing an additional and significant work-related limitation of function." In particular, she claims she has both an affective disorder resulting in many moderately to markedly limited mental abilities, and a restriction to essentially a light exertional work activity level.

With respect to the restriction to light work, the only evidence in the record supporting this comes from Binh Lieu, M.D., who opined in late October 2006, the plaintiff overall "should be able to lift and carry 20 pounds for 2/3 of an 8-hour workday," "stand for 2/3 of an 8-hour workday and walk for 2/3 of an 8-hour workday." Tr. 269. Dr. Lieu further opined that plaintiff had "no limitations with sitting, bending, stooping, crouching or kneeling," and did "not require a handheld assistive device." Id. With respect to Dr. Lieu's opinion, the ALJ found as follows:

> . . . I have also considered and given no weight to the October 21, 2006, opinion of Binh Lieu, M.D., that the claimant is exertionally limited to light work . . . Dr. Lieu's opinion appears to be based primarily on the subjective reports of the claimant that she has a history of neck problems and right knee problems. Physical examination revealed some pain with palpation but little objective evidence of any abnormality. . . . The claimant did not report any physical limitations other than difficulty hearing when she filed her application for Supplemental Security Income payments. She also did not report any physical limitations during her most recent psychological evaluation with Brian Adams, Ph.D., on September 29, 2006 . . .

Tr. 22. These are valid reasons for rejecting Dr. Lieu's opinion, particularly in light of the ALJ's crebility determination, which, as explained below, was proper. See Batson, 359 F.3d at 1195 (ALJ need not accept opinion of treating physician if it is inadequately supported by clinical findings); Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999) (opinion of physician premised to large extent on claimant's own accounts of her symptoms and limitations may be disregarded where those complaints have been properly discounted). Accordingly, the Court finds that Dr. Lieu's limitation to light exertional work activity does not satisfy the second requirement for meeting Listing 12.05(C).

With respect to plaintiff's assertion that she has an affective disorder resulting in additional and significant work-related limitations, the evidence in the record – though, as discussed above, arguably supportive of the ALJ's conclusion that Drs. James Adams, Quinci and Schneider primarily attributed her mental functional limitations to cognitive deficits – is inconclusive as to whether she has been so limited by such a disorder. As noted above, Dr. James Adams did attribute all of plaintiff's limitations in social

functioning to her depression and anger. Tr. 212. Further, while it is true that Dr. Adams assessed plaintiff with more limitation due to cognitive factors, this difference of one lacks any real significance, as he still noted several areas in which she was significantly limited, but not specifically because of those deficits. Id. On the other hand, in the longer and more detailed evaluation report he completed at the time, Dr. Adams described plaintiff as having exhibited only "mild depression." Tr. 208. In addition, Dr. Adams based his opinion that plaintiff's mental functional limitations likely would remain in place for at least six months on the untreatable nature of her borderline intellectual functioning. Tr. 213.

Also as discussed above, Dr. Peterson and Dr. van Dam found plaintiff's many moderate mental functional limitations to be due at least in part to her depressive disorder. See Tr. 224-40. Nevertheless, they did not state to what extent that impairment contributed to those limitations or to the severity thereof. Id. In addition, it is clear that Drs. Peterson and van Dam based their findings on the evaluation performed by Dr. James Adams. See Tr. 239. As such, to the extent that Dr. Adams deemed plaintiff's long-term limitations to be due primarily to her cognitive deficits, as opposed to her symptoms of depression, the same conclusion, or at least emphasis, reasonably could be imputed to Dr. Peterson and Dr. van Dam as well. See Lester, 81 F.3d at 830-31 (non-examining physician's opinion constitutes substantial evidence only if consistent with other independent evidence in record).

In addition, as discussed above, although Dr. Quinci did diagnose plaintiff with depression (Tr. 215), all of the specific mental functional limitations he assessed her with he apparently attributed to her cognitive deficits (Tr. 216). Indeed, Dr. Quinci noted that plaintiff appeared to be only "mildly depressed," and based his opinion that she would be precluded from being able to perform in most normal work environments entirely on her "[s]ignificant cognitive impairment." Tr. 219. Like Dr. James Adams, Dr. Quinci also appears to have based his estimation that plaintiff likely would continue to be limited in her mental functional capabilities to the extent he found for a minimum of 12 months on his opinion that her low cognitive functioning could not be treated. Tr. 217.

Dr. Schneider, again as noted above, diagnosed plaintiff with depression (Tr. 252), and specifically noted her to be "emotionally fragile" (Tr. 249). Because he did not expressly attribute any specific mental functional limitations to that diagnosis, however, it is not entirely clear exactly to what extent he felt she was affected by that impairment in terms of her work-related limitations (see Tr. 249-50, 253-54). Further,

Dr. Schnieder too found plaintiff's mental functional limitations likely would be permanent and that mental health intervention likely would not restore or substantially improve her ability to work in a regular and predictable manner. Tr. 254. This thus indicates that he, as with Dr. James Adams and Dr. Quinci, may have based these findings on her cognitive impairment and not her depression.

Lastly, as noted above, Dr. Brian Adams did not diagnose plaintiff with depression or any other affective disorder, although he did note that she had "reported depression in the past that could return if she loses employment again, due to her cognitive difficulties." Tr. 265. As such, although there is evidence in the record that plaintiff has been diagnosed with an affective disorder that has been linked to at least some mental limitations, it is not clear the extent to which that impairment has had an impact on her ability to function in a work setting. Thus, while, as discussed above, the ALJ's stated reasons for not finding plaintiff had an affective disorder that resulted in additional and significant work-related limitations were inadequate, it cannot be said for certain that to the extent such limitations do in fact exist, they have had a significant impact on plaintiff's ability to function. Accordingly, further consideration of the medical evidence and of this issue at this step is required.

With respect to the additional requirement that she suffer from "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested" prior to age 22, plaintiff asserts she is not required to present evidence of such deficits, because she has presented evidence of IQ scores in the range of 60 through 70 after age 22. To support this argument, plaintiff relies on decisions from several circuit courts holding that "absent evidence of sudden trauma that can cause retardation," IQ scores in the range of 60 through 70 obtained after age 22 "create a rebuttable presumption of a fairly constant IQ throughout" a claimant's life. Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001)[4]; Muncy v. Apfel, 247 F.3d 278, 734-35 (8th Cir. 2001); Luckey v. U.S. Dept. of Health & Human Servs., 890 F.2d 666, 668-69 (4th Cir. 1989).

Other circuit courts, however, have not adopted this presumption. See Foster, 279 F.3d at 354-55; Maggard, 167 F.3d at 380. As the Sixth Circuit noted, amendments made to the regulations "clarify that a

---

[4]In so holding, the Eleventh Circuit looked to the Commissioner's statement that: "the significantly subaverage general intellectual functioning with deficits in adaptive behavior must have been initially 'manifested' during the developmental period. *We have always interpreted this word to include the common clinical practice of inferring a diagnosis of mental retardation when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the developmental period.*" Id. at 1269 (quoting 65 FR 50746, 50772 (August 20, 2000)) (emphasis added by court of appeals).

claimant will meet the listing for mental retardation only '[i]f [the claimant's] impairment satisfies the diagnostic description in the introductory paragraph *and* any one of the four sets of criteria." Foster, 279 F.3d at 354 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A) *as amended by* 65 Fed.Reg. 50746, 50776 (August 21, 2000)) (emphasis added by court of appeals)[5]; see also Novy v. Astrue, 497 F.3d 708, 709 (7th Cir. 2007) ("[A] low IQ, but not an IQ below 60, is insufficient, even with the presence of some impairment, to establish disability per se on grounds of mental retardation.").

As noted above, even those circuits that have adopted the presumption, allow the ALJ to consider evidence in the record to rebut it, including evidence that calls into question the validity of the claimant's IQ scores. See Hodges, 276 F.3d at 1268-69; Muncy, 247 F.3d at 734-35; Luckey, 890 F.2d at 668-69. Indeed, the Commissioner has stated that a diagnosis of mental retardation prior to age 22 is inferred only "*when the longitudinal history and evidence of current functioning demonstrate that the impairment existed before the development period*." Hodges, 276 F.3d at 1269 (quoting 65 FR 50746, 50772 (August 30, 2000) (emphasis added by court of appeals). Those courts that have not adopted the presumption also will uphold an ALJ's finding that a claimant's mental impairment did not initially manifest prior to age 22, if that finding is supported by substantial evidence. Foster, 279 F.3d 354-55; Maggard, 167 F.3d at 380. In terms of evaluating the sufficiency of the evidence in the record regarding diagnoses of mental retardation, therefore, both approaches appear to be fairly similar.

Regardless of whether or not the presumption of a fairly constant IQ score applies in this circuit, the undersigned finds that remand for further consideration of the issue as to whether plaintiff has exhibited deficits in adaptive functioning that initially manifested prior to age 22 is appropriate. Plaintiff argues she has demonstrated adaptive functioning deficits in academics manifesting prior to age 22, pointing to school records showing that she left high school in the tenth grade with the ability to read only at the third grade level and spell only at the fourth grade level, and that she had been recommended for placement in special education classes. See Tr. 93, 167, 175. The record further shows testing was

---

[5]The only Ninth Circuit decision concerning this issue is Fanning v. Bowen, 827 F.2d 631 (9th Cir. 1987). In Fanning, the Court of Appeals found that because the claimant in that case had an IQ of 69, "[t]he determinative issue" was whether he suffered "from a physical or other mental impairment which imposes an additional and significant work-related limitation of function." Id. at 633. The Ninth Circuit, however, decided Fanning based on a much older version of Listing 12.05(C). See Id. (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C) (1986)). Further, the Court of Appeals did not discuss whether it would adopt the presumption adopted by the Eleventh, Eighth and Fourth Circuits, or whether it would follow the lead of the Sixth and Seventh Circuits. It thus appears that this issue has not yet been decided in this circuit.

performed prior to the age of 22, which revealed a verbal IQ score of 70. Tr. 169.

Defendant counters that school records also show plaintiff was noted to be friendly and cooperative at the time. See Tr. 167. The fact that plaintiff may have been friendly and cooperative, however, does not detract from the deficits the above evidence reveals in her ability to function academically, nor does it diminish the borderline IQ test score she received prior to age 22. See Christner v. Astrue, 498 F.3d 790, 793 (8th Cir. 2007) (low-grade dropout and participation in special education classes likely meets burden of establishing onset before age 22); Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006) ( struggling in special education classes through ninth grade, having trouble with reading, writing and math, and dropping out of school constituted evidence of mental retardation manifesting prior to age 22). That evidence does provide at least some indication, though, of adaptive ability in the area of social functioning.

There is other evidence in the record, however, that plaintiff's limitations in adaptive functioning may not have been as great as her low IQ score and academic difficulties might suggest. For example, as pointed out by defendant, her school records also indicate she knew all of her personal data, could fill out employment forms, and lived semi-independently. See Tr. 167. As noted by the ALJ, furthermore, plaintiff reported dropping out of school "to live with her boyfriend whom she subsequently married at age 20." Tr. 19, 248, 256. In addition, it appears plaintiff was under 22 years old at the time she gave birth to the first of her four children, and, also as noted by the ALJ, the record is devoid of any evidence that she has had difficulty in providing care for them due to her mental impairments. Tr. 19, 247, 256, 278.

While the Eighth Circuit, as noted above, has found difficulties in academic functioning sufficient to satisfy the deficits in adaptive functioning requirement, the Seventh Circuit denoted that requirement to mean an "inability to cope with the challenges of ordinary everyday life," stating further that if a claimant "cannot cope with those challenges," he or she is "not going to be able to hold down a full-time job." Novy, 497 F.3d at 710 (citing American Psychiatric Association, Diagnostic and Statistical manual of Mental Disorders, Text Revision (DSMIV-TR) 42 (4th ed. 2000)). In regard to the claimant's situation in Novy, the Seventh Circuit held as follows:

> . . . [T]he administrative law judge was on firm ground in finding that she can cope. She lives on her own, taking care of three children (possibly four-she definitely has four but the record is unclear whether more than three of them are living with her) without help, feeding herself and them, taking care of them sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction. Her intellectual limitations pose serious

> challenges to her ability to raise a family on her own. But she has overcome those challenges well enough that she should be able to hold down a full-time job-or so at least the administrative law judge was entitled to conclude without courting reversal.

Id. Plaintiff's situation is substantially similar to that of the claimant in Novy. Indeed, the only reason her children are no longer in her custody, but that of her father-in-law, appears to be because of her marijuana use. See Tr. 247.

Despite her demonstrated academic difficulties in school, therefore, the record indicates plaintiff has been able to cope fairly adequately with the challenges of at least some of the more difficult aspects and responsibilities of ordinary everyday life, i.e., marriage and parenting, beginning prior to age 22 and continuing thereafter. Thus, while plaintiff's academic difficulties do provide some evidence of deficits in adaptive functioning during the relevant time period, the undersigned finds the other evidence addressed above ordinarily would be sufficient for upholding the ALJ's determination that she has failed to establish such deficits in this case. Nevertheless, it does not appear that the ALJ took into account in his step three analysis the fact that the record contains documentation of a verbal IQ test score of 70 obtained before the age of 22. It may be that the evidence in the record of plaintiff's adaptive functioning the ALJ relied on in his determination still would be sufficient to call into question the validity of that score. However, given the ALJ has not conducted that analysis, and in light of the questions surrounding the second prong of the Listing 12.05 criteria, remand for further consideration of this issue is proper as well.

III.     The ALJ Did Not Err in Assessing Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.;

Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

The ALJ in this case found plaintiff to be "not entirely credible" in regard to her statements concerning the intensity, persistence and limiting effects of the symptoms she claims have resulted from her mental impairments.  Tr. 21.  Plaintiff argues the ALJ's credibility determination is erroneous, because he did not identify what specific testimony of hers was not credible and what specific evidence showed it to not be credible.  In addition, plaintiff asserts that while the ALJ did note some inconsistencies between the evidence in the record and her alleged symptoms, psychological examinations and her school records and work history are consistent with those symptoms.  The undersigned finds, however, that overall the ALJ's credibility determination here was proper.

The ALJ essentially provided three reasons for discounting plaintiff's credibility.  First, the ALJ discounted her credibility because her alleged symptoms were not consistent with the medical evidence in the record regarding her work-related limitations stemming from her mental impairments.  Tr. 21; see Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (determination that claimant's complaints are inconsistent with clinical observations can satisfy clear and convincing requirement).  As discussed above, however, the ALJ improperly evaluated the medical opinion evidence from the examining and non-examining psychologists in the record regarding those limitations.  Accordingly, the undersigned does not find this to be a valid reason for discounting plaintiff's credibility.

On the other hand, the ALJ did discount plaintiff's credibility for the following additional reason:

The claimant has alleged disability beginning August 18, 2001.  However, her earnings record which documents earnings of $18,504 in 2001 and $10,604 in 2002 suggest she was able to work at a level consistent with the Social Security Administration's definition of substantial gainful activity after that date. . . . Although the claimant

testified that she was nearly let go from her most recent job at Burger King because it took her three weeks to learn the job, she was subsequently able to maintain that job for an extended period [sic] time during [sic] years 2001 and 2002.

Tr. 21-22. Smolen, 80 F.3d at 1284 (ALJ may consider claimant's work record). As discussed above, this evidence is not sufficient to discount the credibility of the opinions of Dr. James Adams, Dr. Quinci and Dr. Schneider, given that their opinions were dated long after plaintiff had stopped working. However, as noted by the ALJ here and by the undersigned above, that work did occur for a substantial period of time after the alleged onset date of disability. This discrepancy, therefore, does call into question plaintiff's credibility, both for that specific period of time and in general.

The third reason the ALJ gave for discounting plaintiff's credibility is that:

. . . While she reported to Dr. Quinci in September 2004 that she left her job at Burger King because she was unable to advance due to inability to use the cash register or computer, she reported to Dr. Schneider in August 2005 that job ended because she continued to get strep throat rather than due to her allegedly disabling mental impairments . . .

Tr. 22. This too was a valid reason for not finding plaintiff to be fully credible. See Smolen, 80 F.3d at 1284 (ALJ may consider ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and other testimony that appears less than candid). These inconsistent statements too certainly call into question plaintiff's allegation that beginning in August 2001, she could no longer work due to her mental impairments. As such, the undersigned finds that the ALJ provided clear and convincing reasons for finding plaintiff to have not been entirely truthful regarding her alleged limitations, and thus that his credibility determination as a whole is supported by substantial evidence in the record. Tonapetyan, 242 F.3d at 1148.

IV.     Steps Four and Five of the Sequential Disability Evaluation Process

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity assessment is used at step four of the sequential disability evaluation process to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

Plaintiff has the burden at step four of the disability evaluation process to show that she is unable to return to her past relevant work. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999). If a claimant cannot perform his or her past relevant work at step four, at step five the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R.§ 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

As noted above, the undersigned rejected plaintiff's argument that she should be found to be unable to maintain employment based on the moderate functional limitations found by Drs. Peterson and van Dam and the vocational expert's testimony regarding missing two days of work per month. Plaintiff does not raise any further specific challenges to the ALJ's findings regarding her residual functional capacity and ability to return to her past relevant work. Nevertheless, given the ALJ's errors in evaluating the medical evidence in the record discussed above, it is not clear that the residual functional capacity with which he assessed plaintiff accurately describes all of her limitations. As such, it also is not clear that plaintiff would be capable of returning to her past relevant work. However, because the ALJ found, albeit erroneously, that plaintiff was not disabled at step four, he was not required to proceed on to step five. See 20 C.F.R. § 416.920 (if claimant is found not disabled at any particular step, disability determination is made at that step, and the sequential evaluation process ends).

V.    This Matter Should Be Remanded for Further Administrative Proceedings

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292. Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."

Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because issues still remain in regard to the medical evidence in the record regarding plaintiff's mental impairments and limitations, whether she is disabled at step three of the sequential disability evaluation process, and whether she is capable of returning to her past relevant work, this matter should be remanded to the Commissioner for further administrative proceedings.  In addition, if it is determined on remand that plaintiff is not disabled at step three, but is incapable of returning to her past relevant work at step four, the Commissioner shall determine at step five whether plaintiff is capable of performing other jobs existing in significant numbers in the national economy.

It is true that where the ALJ has failed "to provide adequate reasons for rejecting the opinion of a treating or examining physician," that opinion generally is credited "as a matter of law." Lester, 81 F.3d at 834 (citation omitted).  However, where the ALJ is not required to find the claimant disabled on crediting of evidence, this constitutes an outstanding issue that must be resolved, and thus the Smolen test will not be found to have been met.  Bunnell v. Barnhart, 336 F.3d 1112, 1116 (9th Cir. 2003).  Further, "[i]n cases where the vocational expert has failed to address a claimant's limitations as established by improperly discredited evidence," the Ninth Circuit  "consistently [has] remanded for further proceedings rather than payment of benefits." Bunnell, 336 F.3d at 1116.  While the ALJ did err in evaluating the medical opinion evidence in the record, it is not at all clear, for the reasons set forth above, that the ALJ would be required to find plaintiff disabled.  Therefore, remand for further proceedings is appropriate.

## CONCLUSION

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff was not

disabled.  Accordingly, the ALJ's decision hereby is REVERSED and REMANDED to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

DATED this 29th day of August, 2008.

Karen L. Strombom
United States Magistrate Judge